Andrew M. Calamari
Lara S. Mehraban
Valerie A. Szczepanik
Kevin P. McGrath
Alison R. Levine
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York  10281
(212) 336-5549 (Levine)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                       :

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | 16 Civ. 6395 (JPO) |
| | : | |
| Plaintiff, | : | ECF CASE |
| | : | |
| - against - | : | AMENDED |
| | : | COMPLAINT |
| MATRIX CAPITAL MARKETS, LLC, | : | |
| NICHOLAS M. MITSAKOS, and | : | JURY TRIAL |
| COURTLIN L. HOLT-NGUYEN, | : | DEMANDED |
| | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------- x

Plaintiff Securities and Exchange Commission ("Commission"), for its Amended

Complaint against defendants Matrix Capital Markets, LLC ("Matrix Capital"), Nicholas M.

Mitsakos ("Mitsakos"), and Courtlin L. Holt-Nguyen ("Holt-Nguyen") (collectively

"Defendants"), alleges as follows:

## SUMMARY

1.      From approximately the spring of 2014 to the summer of 2016 (the "Relevant

Period"), Defendants made false and misleading statements to prospective investors and financial

institutions in order to raise funds for investment vehicles to be managed by Matrix Capital, an investment adviser registered with the State of California, and Mitsakos, its principal. These numerous false and misleading statements included lying about investment returns purportedly achieved by Defendants, assets under management ("AUM"), and broker and auditor relationships.

2.     For example, during the Relevant Period, Defendants prepared and distributed to numerous prospective investors and one client written marketing materials falsely stating that Defendants' investment strategies had yielded outsized returns through trading stocks. One newsletter Mitsakos sent to prospective investors stated that Matrix Capital had achieved annual returns of from 20% to more than 66% from 2012 through 2015. In reality, Mitsakos and Holt-Nguyen simply made up these purported returns by creating a "model" portfolio of hypothetical holdings and trades, not based on actual trading (the "Model Portfolio"). When this Model Portfolio failed to achieve the returns Defendants wanted, Mitsakos and Holt-Nguyen retroactively changed the Model Portfolio's fictitious holdings and trades in order to achieve the results Mitsakos wanted to tout.

3.     During the Relevant Period, Mitsakos also told prospective investors and one client that Matrix Capital had as much as $60 million in AUM. In reality, Matrix Capital did not manage any funds until the fall of 2015, and it never managed anywhere near $60 million.

4.     Mitsakos similarly told prospective investors that the Matrix Portfolio was audited or otherwise verified by a nationally-recognized auditing firm and that Matrix Capital had prime brokerage relationships with major banking institutions. Mitsakos and Holt-Nguyen distributed marketing materials containing this false information. In fact, Mitsakos and Holt-Nguyen knew or recklessly disregarded that these statements were false.

5.      In reliance on Defendants' misrepresentations, a Cayman Islands-based asset manager and private merchant banking group and/or its principals (the "Investment Manager") formed a new fund (the "Joint Fund") for Mitsakos and Matrix Capital to manage.  The Investment Manager subsequently purchased $2 million worth of shares in the Joint Fund and then transferred $2 million to Mitsakos and Matrix Capital to invest in securities.

6.      Mitsakos and Matrix Capital subsequently misappropriated approximately $800,000 of the Joint Fund's money—spending the majority on unauthorized personal and business expenses—in contravention of their representations to and agreements with the Investment Manager.

## VIOLATIONS

7.      By engaging in the conduct set forth in this Complaint:

a.      Defendants Matrix Capital and Mitsakos have violated, and unless enjoined will continue to violate, Section l7(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5];

b.      Defendant Holt-Nguyen has violated, and unless enjoined will continue to violate, Sections l7(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and §§ 77q(a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5];

c.      Defendants Matrix Capital and Mitsakos have violated, and unless enjoined will continue to violate, Sections 206(1), 206(2), and 206(4) of

the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

d.   Defendants Mitsakos and Holt-Nguyen have aided and abetted, and unless enjoined will continue to aid and abet, Matrix Capital's (and in the case of Holt-Nguyen, Mitsakos's) violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## JURISDICTION AND VENUE

8.   This Court has jurisdiction over this action pursuant to Sections 15(b), 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77o(b), 77t(b), 77t(d), and 77v(a)], Sections 20(e), 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78t(e), 78u(d), 78u(e), and 78aa], and Sections 209(d), 209(e), 209(f) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-9(f) and 80b-14].

9.   Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Certain transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  For instance, during the Relevant Period, Defendants sent false and misleading statements into Manhattan by email; made false or misleading statements to

prospective investors, investment banks, and brokers based in Manhattan; and Mitsakos and

Matrix Capital misappropriated funds from an account held at a financial services institution

based in Manhattan.

10.     Defendants, directly or indirectly, used means or instrumentalities of interstate

commerce, of the mails, and/or of the facilities of a national securities exchange in connection

with the transactions, acts, practices, and courses of business alleged herein.

### DEFENDANTS

11.     **Matrix Capital** is a Delaware limited liability company with its principal place of

business in San Francisco, California.  Matrix Capital is an investment adviser registered with

the State of California.  Matrix Capital purports to have been managing at least one fund and

separately managed account since approximately January 2012, referred to herein as the "Matrix

Portfolio."

12.     **Mitsakos**, age 57, is a resident of San Francisco, California and is the founder,

Chairman, Chief Executive Officer, and Chief Investment Officer of Matrix Capital.  Defendants

held Mitsakos out to prospective investors and others as the originator of Matrix Capital's

investment strategies, and Mitsakos directed what little actual trading in securities that Matrix

Capital did from approximately October 2015 to June 2016.

13.     **Holt-Nguyen**, age 35, is a resident of Honolulu, Hawaii.  Defendants held Holt-

Nguyen out to prospective investors and others as an Associate at Matrix Capital.

### OTHER RELEVANT ENTITIES

14.     **Investment Manager** is a Cayman Islands-based asset manager and private

merchant banking group.  It served as the investment manager to the Joint Fund.  In March 2015,

Investment Manager appointed Matrix Capital as portfolio manager and sub-advisor to the Joint Fund.

15.     **The Joint Fund** is a Cayman Islands-based segregated portfolio of a segregated portfolio company registered in the Cayman Islands (the "Company").  The principals of the Investment Manager created the Joint Fund as a second segregated portfolio of the Company in approximately March 2015.  The Joint Fund offered "Investor Shares in Classes denominated USD to be issued to selected investors . . .: Class A1 USD Investor Shares . . . [and] Class A2 USD Investor Shares . . ."  The proceeds of issuance of the shares of the Joint Fund were to be "invested, reinvested, and applied for the benefit of that Segregated Portfolio only . . . ."  The "Investment Strategy" of the Joint Fund was to "invest primarily in equity and equity-related securities which are listed on exchanges and markets in the United States.  . . .  The Joint Fund's assets may be invested on a long and short basis in the full range of equity and equity-related securities (including convertible notes, options, depository receipts, index futures, industry baskets and exchange traded funds) and related derivatives."

**FACTS**

I.     <u>**BACKGROUND**</u>

16.     Mitsakos formed Matrix Capital in October 2013.

17.     From at least the spring of 2014, Mitsakos began to solicit investors located in California and New York City for the launch of an investment vehicle he referred to at times as a "hedge fund," an "investment fund," "the Matrix Global Micro Fund," and/or the "Long/Short Value-based Investments-Global Micro Fund" (the "Matrix Capital Fund") and other pooled investment vehicles.  Mitsakos networked with various individuals at brokerage firms and other

6

fund service providers, and asked those individuals to introduce him to potential investors for the Matrix Capital Fund.

18.     In order to solicit investors in the Matrix Capital Fund, and later the Joint Fund, Defendants orchestrated a scheme in which they falsely marketed Mitsakos and Matrix Capital as experienced money managers with a highly successful track record.

19.     In furtherance of this scheme, during the Relevant Period, Mitsakos and Holt-Nguyen created marketing materials to solicit investors, including a monthly Matrix Capital newsletter (the "Matrix Newsletter"), which they emailed out to prospective investors, including the Investment Manager.  These Matrix Newsletters set forth "Minimum Investment" criteria: $1 million for individual investors and $5 million dollars for institutional investors.  Mitsakos and Holt-Nguyen each prepared portions of the Matrix Newsletter.  The Matrix Newsletters contained materially false information, including but not limited to the Matrix Portfolio's and Matrix Capital's (1) historical performance; (2) AUM; and (3) brokerage and auditor relationships.

20.     During the Relevant Period, Mitsakos met with and had calls with dozens of prospective investors—institutional investors, individual investors, and financial institutions that could provide "capital introductions"—in order to obtain "seed" capital for the Matrix Capital Fund and later the Joint Fund.  Mitsakos provided the Matrix Newsletter to prospective investors along with other documentation containing the same materially false information that was in the Matrix Newsletter, including due diligence questionnaires, pitch books, and other fund summary documents.

21.     For example, Mitsakos met with one prospective investor ("Investor A") in approximately October 2015 in an effort to raise capital to be managed by Matrix Capital.  Over

the course of the next six months, Mitsakos made numerous in person, over the phone, and email pitches to this investor where he described his "investment process," and touted Matrix Capital's past performance results, AUM, and relationships with premier brokers and auditors.

22.     On February 28, 2016, Mitsakos sent Investor A a Matrix Capital "Due Diligence Questionnaire" he had filled out for a different prospective institutional investor and a "Matrix Capital Long/Short Equity Fund Summary."  The Due Diligence questionnaire stated Matrix Capital's historical performance as being between 25.4% to 66.3% between 2012 and 2014, and up 49.5% in 2015 YTD; that the Matrix Capital Fund had $30 million in AUM and a "$3 billion capacity" and that it planned to reach that capacity over the next "3 to 5 years."  The Fund Summary also stated that "The Matrix Long/Short Equity Fund launched in 2015, and has approximately $50 million in capital commitments. . . . Matrix is targeting a total of approximately $1 billion under management."

## II.     MISREPRESENTATIONS AND OMISSIONS

### A.     The Matrix Portfolio's Historical Performance

23.     In approximately the spring of 2014, Mitsakos and Holt-Nguyen created the Model Portfolio, which was based on hypothetical holdings and trading, not actual holdings and trading.

24.     When the Model Portfolio did not produce results that Mitsakos and Holt-Nguyen believed would attract investors, Mitsakos and Holt-Nguyen retroactively modified the Model Portfolio's hypothetical holdings and trading to improve the historical monthly and annual performance results.

25.     In the summer of 2014, Mitsakos and Holt-Nguyen began sending monthly Matrix Newsletters to prospective investors.  The Matrix Newsletters contained, among other

information, the Matrix Portfolio's purported yearly and monthly performance results dating

back to January 2012. In reality, Matrix Capital had not managed any actual assets, and the

results Defendants passed off as the Matrix Portfolio's actual performance were instead a

complete fabrication, based on the retroactive reengineering of the Model Portfolio's holdings

and trading.

26.     The Matrix Newsletters listed Mitsakos as the contact person for Matrix Capital

and stated that he was, among other things, responsible "for the oversight and implementation of

Matrix operations and investment strategy" and all investor relations and communications, and

that he reviewed and approved all investment decisions. The Matrix Newsletters also listed

Holt-Nguyen as an "Associate" at Matrix Capital.

27.     During the Relevant Period, Mitsakos and Holt-Nguyen continued to retroactively

change the Model Portfolio's hypothetical holdings and trading in order to create the appearance

of high returns. Mitsakos and Holt-Nguyen sent these purported results—falsely represented as

the results of actual holdings and trading—to registered investment advisers, broker-dealers,

prospective investors, including the Investment Manager and/or its principals, who became

Matrix Capital's client.

28.     Defendants' false statements concerning the Matrix Portfolio's performance

results grew more exaggerated over time. For example, on May 12, 2014, Holt-Nguyen sent

Mitsakos purported monthly returns for 2014 for the Model Portfolio, reflecting, among other

things, (- 1.3%) for January, 7.7% for February, (-5.6%) for March, and 0.0% for April.

Mitsakos responded the next day, "Let's talk about our monthly performance in 2014.

Obviously, we didn't really actively manage it, but there are some big monthly losses that I don't

think we would've had if we were managing the portfolio. I know this is a bit of revisionist

history, but I don't think it's too inaccurate to apply our standards retroactively." Holt-Nguyen responded "I agree," and suggested that he could alter some positions to "see what that does to the performance." Holt-Nguyen subsequently told Mitsakos he would "re-run the monthly performance numbers when [Individual A] [was] not hovering around the bloomberg."

29.     On May 14, 2014, Holt-Nguyen sent Mitsakos the following "revised monthly returns" from the Model Portfolio after "rebalancing" two positions: (-1.5%) for January, 9.6% for February, (-4.4%) for March, and (-.4%) for April. Mitsakos subsequently disseminated to prospective investors this false performance information purporting to be Matrix Capital's returns based on trading securities.

30.     On July 14, 2014, Holt-Nguyen sent Mitsakos an email with "draft" annual returns for the Model Portfolio as follows: 24.4% in 2012; 55.8% in 2013 and 5.0% YTD. He also wrote, "[s]hould we remove the non-US holdings from our model portfolio as of a certain date or just assume we never owned them at all? . . . Excluding them would increase the track record . . . Once we decide what to do with the non-US names, I can re-run the performance numbers and finish up the [Matrix] newsletter draft." Mitsakos responded, "I appreciate you making the adjustments we discussed." That same day, Holt-Nguyen sent Mitsakos a "first draft of the [Matrix] newsletter" and modified annual returns for the Model Portfolio as follows: 24.4% in 2012; 63.5% for 2013; and 4.83% for 2014 YTD.

31.     On July 15, 2014, Holt-Nguyen sent Mitsakos an updated version of the Matrix Newsletter reflecting changes after he "re-ran the performance to include a 5% position in Western Digital." The next day, Mitsakos wrote to Holt-Nguyen "I think the cash balance we assume for 2014 is too high. We should reduce the cash we held to 10% of the portfolio, and then allocate pro rata that additional cash to all the other investments. Let's see how that impacts

our performance for 2014." Holt-Nguyen responded, "Ok. I'll reallocate the cash to our holdings

on January 1, 2014 and re-run the numbers."

32.     On July 17, 2014, Holt-Nguyen emailed Mitsakos a revised Matrix Newsletter

with the following historical performance results:  24.4% for 2012, 69.2% for 2013, and 7%

YTD through June 2014.  Several days later, Mitsakos sent a financial institution the Matrix

Newsletter containing this performance information.  He also provided these performance figures

to Hedge Fund Alert newsletter, which cited them and referenced Matrix Capital's "strong track

record" in an article on July 30, 2014 about the launch of Mitsakos's new "hedge fund."

33.     On November 17, 2014, Matrix Capital sent to prospective investors and financial

services firms an email with the subject "Matrix Capital Performance Update:  October 2014

-2.7%, YTD +4.0%" and attached a "Matrix Capital Monthly Performance Report" as of

November 14, 2014, which included the below chart of fictitious returns:

| Performance Details | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Matrix Capital | | | | | | | | | | | | | |
| 2014 | -0.3% | 9.5% | -4.2% | -0.9% | 1.7% | 1.6% | -2.0% | 6.7% | -4.4% | -2.7% | | | 4.0% |
| 2013 | 5.4% | -2.1% | 3.2% | 6.2% | 10.6% | -3.8% | 15.7% | -3.2% | 3.9% | 9.4% | 2.3% | 6.2% | 66.3% |
| 2012 | 11.7% | 5.0% | 3.3% | -1.4% | -3.4% | 3.6% | -2.5% | 4.3% | -1.5% | -2.0% | 2.2% | 4.6% | 25.4% |
| | | | | | | | | | | | | | |
| S&P 500 Index | -3.6% | 4.3% | 0.7% | 0.6% | 2.1% | 1.9% | -1.5% | 3.8% | -0.9% | 2.3% | | | 9.2% |
| DJ CS L/S Equity Index | -1.7% | 2.7% | -2.5% | -1.8% | 1.4% | 0.3% | -0.6% | 0.4% | -0.4% | | | | -2.4% |

34.     On January 9, 2015, Holt-Nguyen calculated the Matrix Portfolio's year-end

performance results for 2014 to be 0.4%—using the hypothetical holdings and trading in the

Model Portfolio.  Mitsakos, however, reported different false results to prospective investors a

week later, claiming that the Matrix Portfolio was up 19.4% in 2014.  This figure not only was

fabricated, but it also was materially inflated even over the hypothetical returns generated by

Defendants' Model Portfolio.

35.      On July 22, 2015, Holt-Nguyen sent an email to Mitsakos reporting the Matrix Portfolio's purported returns for various time periods:  117.1% Since Inception; 25.4% for 2012; 66.3% for 2013; 0.4% for 2014; (-2.8%) Trailing 12 Months; 3.7% for 2015 YTD; and 24.8% Annualized Since Inception.

36.      Later that day, Mitsakos emailed the Investment Manager the following made-up Matrix Portfolio performance numbers, which were materially inflated over the already fabricated returns that Holt-Nguyen had sent him earlier that day:  199.3% Since Inception (January 2012); 25.4% for 2012; 66.3% for 2013; 20.9% for 2014; 18.4% Trailing 12 Months; 18.6% for 2015 YTD; 35% Annualized Since Inception.

37.      On April 6, 2016, Mitsakos sent Investor A a Matrix Newsletter, dated March 31, 2016, which included the following chart, showing year-to-date performance numbers ranging from 20.9% to 66.3% for the years 2012 through 2015:

| Performance Details | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Matrix Capital** | | | | | | | | | | | | | |
| 2016 | -2.9% | 2.8% | 0.9% | | | | | | | | | | 0.9% |
| 2015 | -0.3% | 6.7% | -5.3% | 8.4% | 1.8% | 2.0% | 4.6% | 14.5% | 6.5% | 3.4% | 1.0% | 0.3% | 51.1% |
| 2014 | -0.3% | 9.5% | 5.2% | -4.9% | 4.2% | 1.8% | 2.0% | 1.7% | 0.1% | -2.2% | 2.4% | 0.4% | 20.9% |
| 2013 | 5.4% | -2.1% | 3.2% | 6.2% | 10.6% | -3.8% | 15.7% | -3.2% | 3.9% | 9.4% | 2.3% | 6.2% | 66.3% |
| 2012 | 11.7% | 5.0% | 3.3% | -1.4% | -3.4% | 3.6% | -2.5% | 4.3% | -1.5% | -2.0% | 2.2% | 4.6% | 25.4% |
| **2016 Index** | | | | | | | | | | | | | |
| S&P 500 | -5.0% | -0.1% | 6.8% | | | | | | | | | | 1.4% |
| DJ CS L/S | -1.7% | -0.3% | -0.2% | | | | | | | | | | -2.3% |
| **2015 Index** | | | | | | | | | | | | | |
| S&P 500 | -3.0% | 5.8% | -1.6% | 1.0% | 1.3% | -1.9% | 2.1% | -6.0% | -2.5% | 8.4% | 0.3% | -1.6% | 1.5% |
| DJ CS L/S | -0.8% | 2.5% | -0.5% | 0.3% | 0.7% | -0.8% | 4.3% | -2.7% | 0.3% | 3.9% | -0.3% | -0.5% | 6.5% |

38.      In June 2016, Mitsakos represented to Investor A that this chart reflected the Matrix Portfolio's performance results from 2012 through 2015, which he claimed was based on trading with his own money and that of friends and family, and since 2015, with institutional investors' money.

39.      These representations were materially false and misleading—Defendants did not conduct any actual trading until October 2015, but only pretended to do so through the

hypothetical Model Portfolio.  Moreover, the results Mitsakos reported to this prospective

investor did not even represent the actual results of the Model Portfolio, but rather results that

Mitsakos had retroactively modified to create the false appearance of higher returns.

40.     During the Relevant Period, Defendants did not tell prospective investors or the

Investment Manager:  (1) that the Matrix Portfolio's performance results were based on a

hypothetical Model Portfolio, not on actual trading; or (2) that even this Model Portfolio was

manipulated after the fact to increase purported returns.  In fact, a disclaimer in a footnote of the

Matrix Newsletter, which noted that the document was for "Qualified and Intuitional Investors

Only", states "Past performance is not necessarily indicative of future results," falsely suggesting

that the performance results presented were based on real trading.

41.     Moreover—since he ran Matrix Capital and was responsible for preparing the

Model Portfolio and for changing its hypothetical returns after the fact—Mitsakos knew (or

recklessly disregarded) that the information he was providing to potential investors and a client

about the Matrix Portfolio's performance results was materially false and misleading.

42.     Similarly, Holt-Nguyen calculated the Model Portfolio's hypothetical returns,

retroactively modified them, and emailed the Matrix Capital's purported historical performance

results out to prospective investors.  He knew (or recklessly disregarded) that the information he

provided to investors about Matrix Capital's historical performance was materially false and

misleading.

**B.     Matrix Capital's Assets Under Management**

43.     During the Relevant Period, Mitsakos and Matrix Capital also made materially

false and misleading statements about the amount of Matrix Capital's AUM.  For example:

a.      During the Relevant Period, Mitsakos represented to potential investors

that he started Matrix Capital in 2012 with approximately $10 million of

his own money as well as "friends and family money";

b.      In March 2014, Mitsakos represented to a brokerage company that Matrix

Capital had or planned to place approximately $35 million in AUM with

another institution;

c.      In May 2015, Mitsakos sent an email to a financial institution in which

Mitsakos represented that Matrix Capital had "[o]ver $100,000,000 in net

liquid assets and total net worth";

d.      On or around November 13, 2015, Mitsakos represented to a financial

institution in a due diligence questionnaire that Matrix Capital had $30

million in "total assets under management by the company across its

different categories of client including the fund";

e.      In November and December 2015, Mitsakos sent to potential investors the

Matrix Newsletter, which represented that Matrix Capital had $60 million

in AUM; and

f.      Between November 2015 and the present, Mitsakos made in-person and

over-the-telephone pitches to a potential investor in which he represented

that Matrix Capital had approximately $60 million in AUM.

44.      Each of these claims was false or misleading.  Matrix Capital received its first and

only investor funds (of approximately $2 million) in September 2015.  Prior to that time, Matrix

Capital did not have any AUM.

45.     Again, Mitsakos, as Matrix Capital's owner and chief investment officer, as well as the person primarily responsible for making and circulating the false and misleading statements, knew (or recklessly disregarded) that the information he provided to potential investors about Matrix Capital's AUM was materially false and misleading.

C.     **The Matrix Portfolio's and Matrix Capital's Brokerage and Auditor Relationships**

46.     During the Relevant Period, and in furtherance of the scheme to make the Matrix Capital Fund appear more appealing to potential investors, Defendants misrepresented the Matrix Portfolio's and Matrix Capital's relationships with certain brokerage and auditing firms.

47.     For example, in November 2015 and December 2015, Mitsakos circulated to potential investors Matrix Newsletters dated October 31, 2015 and November 30, 2015, which represented that Matrix Capital used Broker A and Broker B, both well-recognized and reputable brokers, as its "Prime Brokers" and used a Big Four auditing firm ("Auditor A") as its auditor. In reality, Matrix Capital did not have a Prime Brokerage relationship with either firm and Auditor A had not performed any work for Matrix Capital.

48.     In June 2016, Mitsakos told Investor A that he used Broker A's platform to place the Matrix Portfolio's trades.  In reality, the Matrix Portfolio never placed a single trade through Broker A's trading platforms and—until approximately October 2015—did not place any trades anywhere.

49.     In June 2016, Mitsakos also told Investor A that Auditor A had audited or otherwise verified all of the Matrix Portfolio's performance results provided in a March 31, 2016 Matrix Newsletter.  In reality, none of the Matrix Portfolio's purported performance results from at least 2012 through 2015 had been audited or otherwise verified by Auditor A; indeed, the performance results were a complete fabrication.

15

50.     Mitsakos knew (or recklessly disregarded) that the information he provided to potential investors about the Matrix Portfolio's and Matrix Capital's brokerage and auditor relationships was materially false and misleading.

51.     Similarly, in August, September, October, and November 2014, Holt-Nguyen emailed to potential investors Matrix Newsletters, each of which represented that Matrix Capital used Auditor A as its auditor.

52.     Holt-Nguyen knew (or recklessly disregarded) that Auditor A had not performed any audit work for Matrix Capital because there was no actual trading to audit.

**III.    Misuse of Client Assets**

53.     In early 2015, Mitsakos was introduced to the principals of the Investment Manager.  He subsequently gave the Investment Manager a Matrix Newsletter dated January 15, 2015, which contained the Matrix Portfolio's falsified performance results from 2012 through 2014, and other portfolio information.  Mitsakos also sent the Investment Manager a pitch book for the "Matrix Global Micro Fund," which described, among other things, Mitsakos's and Holt-Nguyen's industry experience, listed two reputable brokers as its "Prime Brokers," Auditor A as its auditor, and included several "case studies" of purported investments.

54.     In reliance on Defendants' written and oral representations regarding Matrix Capital—including its purported "track record," other investors in the purported fund, and Mitsakos's industry experience—the Investment Manager decided to enter into a business relationship with Mitsakos and Matrix Capital whereby they would jointly run a new fund. Matrix Capital would be responsible for trading the Joint Fund's capital, the Investment Manager would fundraise, and they would divide any fees that the Joint Fund earned.

16

55.     In approximately March 2015, the Investment Manager created the Joint Fund as a segregated portfolio of the Company.  According to a March 2015 Confidential Private Placement Memorandum ("PPM") relating to the placing of investor shares in the Joint Fund, the Investment Manager was entitled to management fees of 3% and performance fees of 25% per year.  The Investment Manager, in turn, was responsible for paying fees to Matrix Capital as the portfolio manager.

56.     On or about March 4, 2015, the Investment Manager sent Mitsakos a letter of intent, which proposed to appoint Matrix Capital as a sub-adviser to the Joint Fund.  The letter contemplated that the Investment Manager and Matrix Capital would enter into a fee-sharing arrangement and that Matrix Capital would "reserve US$ 500 million of its [long / short equities] trading capacity for [the Investment Manager]."

57.     In March 2015, the Investment Manager and Matrix Capital entered into a Portfolio Management Agreement ("PMA") whereby the Investment Manager appointed Matrix Capital to be the portfolio manager and sub-adviser for the Joint Fund.  According to the PMA, Matrix Capital was required to consult with the Investment Manager before making certain investment decisions regarding the Joint Fund (such as leveraging the investment portfolio of the Joint Fund) and was "at all time[s] . . . subject to the overall supervision" of the Investment Manager.

58.     On or about March 23, 2015, the Investment Manager and Matrix Capital entered into a Relationship Agreement whereby the Investment Manager would pay Matrix Capital as the portfolio manager:

> a.     100% of the management fees for the first $50 million in aggregate value of investment in the "Matrix Investment Strategy" by the Joint Fund;

      b.       50% of any management fee for any sums in excess of $50 million of investment in the "Matrix Investment Strategy" by the Joint Fund; and

      c.       50% of the performance fee with respect to all monies invested in the "Matrix Investment Strategy" by the Joint Fund.

59.     On or about August 31, 2015, the Investment Manager executed and delivered a signed "Subscription Agreement" for $2 million of shares in the Joint Fund to the Joint Fund's Administrator in the Cayman Islands.  Approximately one week later, the Investment Manager transferred $2 million from an account in its own name into an account in the Joint Fund's name for the "subscription to the [Joint Fund]".

60.     Around the time that the Joint Fund received the subscription from the Investment Manager, Mitsakos advised Holt-Nguyen that "the first capital was in" and set up a call with Holt-Nguyen to "discuss the portfolio."

61.     On or about September 18, 2015, the Investment Manager and/or its principals authorized the Joint Fund's Administrator to transfer and did transfer approximately $2 million to an account for Mitsakos and Matrix Capital to manage on the Joint Fund's behalf, pursuant to the various agreements, including the Subscription Agreement, Portfolio Management Agreement and Relationship Agreement.  The Investment Manager and/or its principals were the sole investor(s) in the Joint Fund at that time.

62.     The Investment Manager intended the money to be placed in a brokerage account in the name of the Joint Fund.  However, Mitsakos misdirected the money into a checking account at a financial institution in the name of Matrix Capital.  Shortly thereafter, Mitsakos transferred $1.2 million (or 60% of the investment) to a brokerage account—also held in Matrix

Capital's name, not the Joint Fund's—with a "first-loss capital program"[1] and used those funds

to trade securities.  Mitsakos and Matrix Capital traded in the first-loss capital program from

approximately October 2015 through June 1, 2016.  During that period, Mitsakos and Matrix

Capital collectively traded more than 1.4 million shares in more than 60 different companies

publicly-traded in the U.S.

63.     Mitsakos did not invest the remaining 40% of the investor funds, approximately

$800,000, as he had represented to the Investment Manager he would do.  Instead, he

misappropriated the majority of the remaining funds to pay various personal and business

expenses.

64.     By January 2016, Mitsakos had spent approximately $600,000 of the Joint Fund's

investment to pay legal bills, credit cards, rent for his home, his Mercedes payment, and other

unauthorized personal and business expenses.  These expenses far exceeded any management or

performance fees to which Mitsakos may have been entitled.

65.     In approximately December 2015, the Investment Manager learned for the first

time that Mitsakos had invested only $1.2 million of its funds and that Mitsakos and Matrix

Capital had misappropriated the remaining $800,000 from the Joint Fund.

66.     The Investment Manager immediately demanded that Mitsakos:  (1) change the

name of the first-loss account where the investor funds were being traded from Matrix Capital's

name to the Joint Fund's name; and (2) reimburse the Investment Manager for the cash Mitsakos

and Matrix Capital misappropriated from the Joint Fund.  Mitsakos said he would do so.

---

[1]     Under this program, a certain New York-based investment adviser agreed to give Matrix Capital 10:1 leverage, which allowed Matrix Capital to deposit with the investment adviser $1.2 million and trade up to $12 million.  Matrix Capital was to receive a "manager payout" of 85% of all profits generated (net of administrative and other fees); Matrix Capital was responsible for 100% of any losses.

67.    Over the next several months, the Investment Manager and its principals repeatedly asked Mitsakos to return the Joint Funds' assets.  Mitsakos returned approximately $200,000 to the Investment Manager in January 2016.  In or around March 2016, Mitsakos signed a letter of authorization assigning the funds in the first-loss account to the Investment Manager, which, by that time, had approximately $1 million dollars in it.  Mitsakos, however, failed to honor his promise to return all of the money that he and Matrix Capital had misappropriated.

68.    In approximately June 2016, as their relationship continued to deteriorate, the Investment Manager terminated the relationship with Mitsakos and Matrix Capital and closed down the first-loss capital account.

### FIRST CLAIM FOR RELIEF
**(Against Defendants Matrix Capital and Mitsakos)**
**Violations of Section 17(a) of the Securities Act**

69.    The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 68.

70.    By engaging in the conduct described above, Defendants Matrix Capital and Mitsakos, in the offer or sale of securities, knowingly, recklessly, or negligently, by the use of means or instruments of transportation or communication in interstate commerce or the mails, directly or indirectly:

a.    employed devices, schemes, or artifices to defraud;

b.    obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.      engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

71.      By engaging in the foregoing conduct, Defendants Matrix Capital and Mitsakos violated and, unless restrained and enjoined, will continue violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### (Against Defendant Holt-Nguyen)
### Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act

72.      The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 68.

73.      By engaging in the conduct described above, Defendant Holt-Nguyen, in the offer or sale of securities, knowingly, recklessly, or negligently, by the use of means or instruments of transportation or communication in interstate commerce or the mails, directly or indirectly:

      a.      employed devices, schemes, or artifices to defraud; and

      b.      engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

74.      By engaging in the foregoing conduct, Defendant Holt-Nguyen violated and, unless restrained and enjoined, will continue violating Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) and 15 U.S.C. §77q(a)(3)].

### THIRD CLAIM FOR RELIEF
### (Against Defendants Mitsakos and Holt-Nguyen)
### Aiding and Abetting Violations of Section 17(a) of the Securities Act

75.      The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 68.

76.     By engaging in the conduct described above and pursuant to Section 15(b) of the

Securities Act [15 U.S.C. § 77o(b)], Defendants Mitsakos and Holt-Nguyen, singly or in concert,

directly or indirectly, aided and abetted, and are therefore also liable for Defendant Matrix

Capital's primary violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], because

they each knowingly or recklessly provided substantial assistance to Defendant Matrix Capital's

violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

77.     By engaging in the conduct described above and pursuant to Section 15(b) of the

Securities Act [15 U.S.C. § 77o(b)], Defendant Holt-Nguyen, singly or in concert, directly or

indirectly, aided and abetted, and is therefore also liable for Defendant Mitsakos's primary

violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], because Defendant Holt-

Nguyen knowingly or recklessly provided substantial assistance to Defendant Mitsakos's

violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

78.     Unless restrained and enjoined, Defendants Mitsakos and Holt-Nguyen will again

aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**FOURTH CLAIM FOR RELIEF**
**(Against Defendants Matrix Capital, Mitsakos, and Holt-Nguyen)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

79.     The Commission re-alleges and incorporates by reference herein each and every

allegation in paragraphs 1 through 68.

80.     By engaging in the conduct described above, Defendants Matrix Capital,

Mitsakos, and Holt-Nguyen knowingly or recklessly, in connection with the purchase or sale of

securities, directly or indirectly, by the use of means or instrumentalities of interstate commerce,

or the mails, or the facilities of a national securities exchange:

a.     employed devices, schemes, or artifices to defraud;

22

    b.      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    c.      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

81.    By engaging in the foregoing conduct, Defendants Matrix Capital, Mitsakos, and Holt-Nguyen violated and, unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

<u>FIFTH CLAIM FOR RELIEF</u>
**(Against Defendants Mitsakos and Holt-Nguyen)**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder**

82.    The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 68.

83.    By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Mitsakos and Holt-Nguyen, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Defendant Matrix Capital's primary violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], because they each knowingly or recklessly provided substantial assistance to Defendant Matrix Capital's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

84.    By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Holt-Nguyen, singly or in concert, directly or indirectly, aided and abetted, and is therefore also liable for Defendant Mitsakos's primary violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder

[17 C.F.R. § 240.10b-5], because Defendant Holt-Nguyen knowingly or recklessly provided substantial assistance to Defendant Mitsakos's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

85.     Unless restrained and enjoined, Defendants Mitsakos and Holt-Nguyen will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SIXTH CLAIM FOR RELIEF
**(Against Defendants Matrix Capital and Mitsakos)**
**Violations of Sections 206(1) and (2) of the Advisers Act**

86.     The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 68.

87.     By engaging in the conduct described above, Defendants Matrix Capital and Mitsakos, while acting as investment advisers, by the use of the means and instrumentalities of interstate commerce and of the mails, directly or indirectly:

a.     employed devices, schemes, or artifices to defraud clients and prospective clients; and

b.     engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon clients and prospective clients.

88.     By engaging in the foregoing conduct, Defendants Matrix Capital and Mitsakos have violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

## SEVENTH CLAIM FOR RELIEF
### (Against Defendants Matrix Capital and Mitsakos)
### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder

89.     The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 68.

90.     By engaging in the conduct described above, Defendants Matrix Capital and Mitsakos, while acting as investment advisers to a pooled investment vehicle, have:

   a.   made untrue statement of material facts or omitted to state material facts necessary to make the statement made, in the light of the circumstances under which they were made, not misleading, to an investor or prospective investor in the pooled vehicle investment; and/or

   b.   otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive, or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

91.     By engaging in the foregoing conduct, Defendants Matrix Capital and Mitsakos have violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## EIGHTH CLAIM FOR RELIEF
### (Against Defendants Mitsakos and Holt-Nguyen)
### Aiding and Abetting Violations of Sections 206(1), (2), and (4) of the Advisers Act
### and Rule 206(4)-8 Thereunder

92.     The Commission re-alleges and incorporates by reference herein each and every allegation in paragraphs 1 through 68.

93.     By engaging in the conduct described above and pursuant to Section 209(f) of the Adviser Act [15 U.S.C. § 80b-9(f)], Defendants Mitsakos and Holt-Nguyen each, singly or in concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commanded,

induced, or procured Defendant Matrix Capital's violations of Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

94.     By engaging in the conduct described above and pursuant to Section 209(f) of the Adviser Act [15 U.S.C. § 80b-9(f)], Defendant Holt-Nguyen, singly or in concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commanded, induced, or procured Defendant Mitsakos's violations of Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rules 206(4)-8 thereunder 8 [17 C.F.R. § 275.206(4)-8].

95.     Unless restrained and enjoined, Defendants Mitsakos and Holt-Nguyen will again aid and abet violations of Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

(a)     finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

(b)     permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert who receive actual notice of the injunction, and each of them from, directly or indirectly, violating or aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1), (2), and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

(c)     ordering Defendants to disgorge, on a joint-and-several basis, all ill-gotten gains plus prejudgment interest thereon;

(d)     ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

(e)     Granting such other and further relief as this Court may deem just and proper.


Dated:   April 7, 2017
         New York, New York

                          Andrew M. Calamari
                          Lara S. Mehraban
                          Valerie A. Szczepanik
                          Kevin P. McGrath
                          Alison R. Levine
                          Attorneys for Plaintiff
                          SECURITIES AND EXCHANGE COMMISSION
                          New York Regional Office
                          Brookfield Place
                          200 Vesey Street, Suite 400
                          New York, New York  10281
                          (212) 336-5549 (Levine)